St. Paul Title & Trust Co. v. Sabin, 112 Wis. 105.

ST. PAUL TITLE & TRUST COMPANY, Respondent, vs. SABIN and another, imp., Appellants.

*September 4 — November 29, 1901.*

*Contracts: Railway reorganization: Practical construction: Principal and surety: Breach of bond: Damages.*

1. A railway reorganization agreement required S., as a condition of the delivery to him of certain bonds of the new company, to procure deeds to such company of all parts of the right of way the title to which was not perfect in the old company, together with releases of all claims existing or which might be asserted against the prop-

erty of the old company. The agreement expressly mentioned, as covered by its provisions, certain claims of title to the right of way, and also included generally "all other claims of title, by whomsoever made or held, that may exist or be held to any portions of said right of way." S. became a director and member of the executive committee of the new company, and knew of the commencement of proceedings for the condemnation of the disputed portions of the right of way, and was kept advised of the steps being taken in that regard, and approved of them. He also authorized the settlement of all but one of such claims. While such settlements were in progress the trustee holding the bonds foreclosed a lien upon them, and on the sale thereof they were bid in by S., and in compliance with the judgment he executed a bond with sureties to secure the performance of the above-mentioned condition of the reorganization agreement. In an action on such bond to recover the amount expended by the obligee in making said settlements, *held:*

(1) The doubt, if any, as to whether the reorganization agreement covered the claims thus settled was removed by the practical construction put upon it by S..

(2) Such construction was binding upon the sureties as well as upon S.

(3) The claims settled being *bona fide* claims and covered by the agreement, the liability on the bond did not depend upon their being valid and enforceable at law.

2. In such a case the plaintiff should recover the sum authorized by S. to be paid in settlement of the claims and, where settlements were not authorized, such sums as the evidence showed to be just, necessary, and proper in procuring settlements; also the necessary disbursements and reasonable attorney's fees in the condemnation proceedings which were known to and acquiesced in by S. or which were necessary and proper to be instituted in order to adjust the claims.

APPEAL from a judgment of the circuit court for St. Croix county: A. J. VINJE, Judge. *Modified and affirmed.*

This is an action against *Sabin,* as principal, and the *United States Fidelity & Guaranty Company,* as surety, upon a certain bond given to the plaintiff to secure the performance of a certain railroad reorganization agreement. The answers of the defendants, in substance, denied that

there had been any breaches of the bond. The action was tried by a jury. The evidence showed that in the year 1892 the Minnesota & Wisconsin Railway Company, a Wisconsin railroad corporation, entered on certain lands owned in severalty by Nelson, Baldwin, D. G. and Lizzie McKay, and the Spring Valley Land Company with the express or tacit consent of such owners, and used the same for railway purposes until December 11, 1893, when a foreclosure action was commenced against the company in the United States circuit court for the Western District of Wisconsin, and a receiver was appointed, who went into possession of the railway and its property. The foreclosure action proceeded in regular course. An order was made requiring creditors to appear and exhibit their claims against the company or be cut off from participation in the proceeds of the sale, and there was due publication of the notice of this order. The receiver incurred an indebtedness in operating the road and preserving the property amounting to something over $80,000. The action proceeded to judgment, and a sale was had, and the property bid off by the plaintiff for a sufficient sum to pay the operating expenses and disbursements made by the receiver, and no more. The sale was confirmed by the court July 15, 1896. The plaintiff's purchase was in trust for the benefit of a new railway company which was to be organized by the bondholders of the old company to operate the railroad.

In August, 1896, a reorganization agreement was entered into by the plaintiff, H. L. Horton, the American Loan & Fidelity Company, G. D. Braman, the Market Insurance Company of Boston, and *D. M. Sabin.* In this agreement it was recited that the parties thereto had contributed and were to contribute various specified sums, aggregating $85,750, to pay the purchase price of the railroad; the defendant *Sabin's* share being $20,000. The agreement further provided for the organization of a new corporation, to be

known as the Minnesota & Wisconsin Railroad Company, with a capital stock of $55,000, which corporation should purchase the railway from the plaintiff, paying therefor $195,000 in five per cent. gold bonds secured by a first mortgage upon the property and $55,000 capital stock. $390,000 of income bonds were also to be afterwards issued, which were to be exchanged for the bonds of the old company dollar for dollar. Of the first mortgage gold bonds, $131,000 was to be distributed among the signers of the agreement in specified amounts; *Sabin's* share being $30,000. Paragraph 4 of the agreement then proceeds as follows:

"The remaining sixty-four (64) of said bonds shall be delivered by said trust company to *D. M. Sabin* upon said *Sabin's* delivering, or procuring to be delivered, to said trust company, good and sufficient deeds running to said new railroad company of all parts of the right of way of said Minnesota & Wisconsin Railway Company the title to which is not now perfect in said last-named company, subject to said foreclosure sale, together with satisfactory releases or assignments of all claims that exist or may exist or are or may be asserted against the railway and property to be purchased as aforesaid by said Minnesota & Wisconsin Railroad Company, and particularly the following claims: (1) The claim or claims of lien upon said railway and property attempted to be established in a certain suit pending in the circuit court in and for the county of St. Croix and state of Wisconsin, which was brought during his lifetime by the late R. B. Langdon, for the purpose of establishing a lien or liens upon said railway and property, or some portion thereof. (2) Certain claims of title asserted by the Spring Valley Land Company, the Minnesota Trust Company, and the West Wisconsin Manufacturing Company, respectively, to portions of the right of way of said Minnesota & Wisconsin Railway Company. (3) All other claims of title, by whomsoever made or held, to any portion or portions of said right of way. (4) A certain claim of the Spring Valley Land Company for rent, or the value of the use and occupation, of certain land, which it is claimed by said Spring Valley Land Company has been used by David B. Dewey, receiver of said Minnesota & Wisconsin Railway Company, for the purposes of his said re-

ceivership, and for which it is claimed that said Dewey is under obligation as such receiver to pay rental or the value of use and occupation. (5) Certain claims of the Minnesota Commercial Company and of the Tremont National Bank of Boston, Massachusetts, respectively, to the ownership of certain rolling stock, locomotives, and equipment that have heretofore been used by said Minnesota & Wisconsin Railway Company and said Dewey, as receiver of the same. (This claim shall be extinguished by proper conveyances of the property to said Minnesota & Wisconsin Railroad Company.) (6) Certain claims of the said Minnesota Commercial Company and said Tremont National Bank, respectively, to rental upon such locomotives, rolling stock, and equipment, or for the value or use thereof, whether the same be against said Minnesota & Wisconsin Railway Company, said Dewey, as receiver thereof, or against each or both of the same. The intention hereof being that said sixty-four thousand dollars ($64,000) of bonds shall be delivered to said *Sabin* when, but not before, he secures to said Minnesota & Wisconsin Railroad Company the good, complete, and unincumbered title to all the railway and property heretofore owned or supposed to have been owned by the Minnesota & Wisconsin Railway Company, and to all the locomotives, rolling stock, and equipment heretofore used by said company or by said Dewey, as receiver of the same."

The remaining portions of the agreement are not essential.

It further appears that *Sabin* did not pay in all of his subscription, and that in July, 1898, he still owed $5,000 thereon, which the plaintiff had advanced for him; and plaintiff held twelve of his first mortgage bonds of $1,000 each and fifty of his income bonds as security for the $5,000 advancement as well as for the repayment of $1,645 which it had paid to clear up certain claims against the old company; that an action was then brought by the plaintiff against *Sabin* to foreclose the plaintiff's lien on said bonds, and that judgment was entered in said action in July, 1898, decreeing that all of the said bonds be sold to satisfy the claims of the plaintiff against *Sabin*, and that the successful purchaser at such sales should give a bond to the plaintiff to

secure the performance of article 4 of said reorganization agreement. It further appears that at the sale under this judgment *Sabin* bid $12,100, and, being the highest bidder, secured the bonds and paid sufficient cash to pay up the amount then owing to the *St. Paul Title & Trust Company*, and gave the bond upon which this action is brought, which bond is dated October 14, 1898, in the penal sum of $10,000, and is conditioned for the payment by *Sabin* of any amount necessary to recompense the plaintiff for all necessary expenses and liabilities incurred by said plaintiff in performing the remainder of the conditions still unperformed of the said reorganization agreement, which, by the terms of paragraph 4 of said agreement, were to be performed by *Sabin;* which said sums were to be paid to the plaintiff at such time as the plaintiff was required to pay the same.

It further appears that in March prior to the rendition of this judgment the new railroad corporation, acting under the direction of the plaintiff, commenced condemnation proceedings in the circuit court for Pierce county for the condemnation of the lands formerly owned by Nelson, the Spring Valley Land Company, and D. G. McKay, and that while these condemnation proceedings were being carried on one H. G. Baldwin instituted condemnation proceedings against the railroad to recover damages for the taking of his land. The various condemnation proceedings were never prosecuted to judgment, but settlements were made with the consent and approval of the defendant *Sabin*, by which $2,000 was paid by the plaintiff to the McKays, $500 to the Spring Valley Land Company, $400 to Baldwin, $100 to Nelson; and it is for these sums, together with the costs, disbursements, and attorney's fees incurred in the condemnation proceedings, that this suit is brought.

At the close of the evidence a motion to direct a verdict for the defendants was overruled, and the jury returned a verdict for the plaintiff for the sum of $4,300.75, upon which judgment was entered, and the defendants appeal.

*Ray S. Reid,* for the appellants.

For the respondent there was a brief by *Baker & Haven,* attorneys, and *Geo. C. Squires,* of counsel, and oral argument by *Mr. Squires.*

WINSLOW, J.   The bond in suit was given by *Sabin* as principal and the *United States Fidelity & Guaranty Company* as surety to secure the reimbursement of the plaintiff for all necessary expenses and liabilities incurred by it in performing the conditions of paragraph 4 of the reorganization agreement which were to be performed by *Sabin,* and which he had not performed at the time the bond was given. The plaintiff contends that by the terms of said paragraph 4 the defendant *Sabin* was required to procure releases of the claims of Nelson, Baldwin, McKay, and the Spring Valley Land Company for lands taken for right of way purposes by the old company, and that, *Sabin* having failed to secure such releases, the amounts necessarily expended by the plaintiff in securing the same may be recovered in an action on the bond.   On the other hand, the defendants contend that paragraph 4 only required *Sabin* to secure good title to said lands, and to secure releases of all valid claims against the property of the new company, and that under the principles laid down in the case of *Kuhl v. C. & N. W. R. Co.* 101 Wis. 42, not only was the title to the lands formerly owned by the parties named perfect in the new company, but said parties had no valid claim of any kind against the new company; and hence that the sums paid by the plaintiff in settlement of such claims were not within the terms of the bond.   Thus it is readily seen that the vital questions in the case are simply as to the proper construction of the two instruments.

Taking up the reorganization agreement first, we do not see how there can be any doubt but that it referred to the claims of Nelson, McKay, Baldwin, and the Spring Valley

Land Company by its very terms.   It expressly names the
claim of title asserted by the Spring Valley Land Company
to a portion of the right of way as one of the claims of
which *Mr. Sabin* is to secure a satisfactory release, and it
also includes generally "all other claims of title, by whom-
soever made or held, that may exist or be held to any por-
tion or portions of said right of way."   It appears that the
above-named claims were substantially the only claims made
to the right of way, and this fact seems conclusive that they
were the claims referred to in the agreement.   But, if there
were any doubt of the meaning upon the face of the agree-
ment itself, it would be removed by the acts of the parties
under it by which it was given a practical construction.
The evidence shows without dispute that *Mr. Sabin* became
a director and a member of the executive committee of the
new railroad company; that a meeting of the executive
committee was held May 22, 1897, at which he was present
and presided, and that a resolution was then passed, with-
out dissent, empowering the president and counsel of the
road to "take such action in relation to the unsettled right
of way matters by compromise, condemnation proceedings,
or otherwise, as they may think best."   This makes it
clear that *Mr. Sabin* knew that condemnation proceedings
were contemplated.   It further appears without dispute
that in the latter part of the year 1897 Mr. H. C. Baker, of
the St. Croix county bar, was employed to commence and
prosecute the condemnation proceedings; that he prepared
the necessary petition, and filed it in March, 1898; that
both before and after the filing of the petition he had nu-
merous interviews and conducted an extensive correspond-
ence with *Mr. Sabin*, in the course of which *Mr. Sabin* was
kept fully advised of the steps being taken, and approved of
them.   In these letters the position assumed by *Mr. Sabin*
is unmistakably that of the responsible party to the litiga-
tion, who is advising and directing his attorney.   The let-

ters run from January, 1898, to December, 1899, and are
too numerous and lengthy to quote, and this statement of
their import must be sufficient.  It also appears that on
July 9, 1899, *Mr. Sabin*, by letter to Mr. G. D. Braman,
stated that he would pay $2,976 to clear up the Spring Val-
ley right of way; that in November, 1899, he authorized the
plaintiff, by letter, to settle the Baldwin claim for $400, and
the McKay claim at an amount not exceeding $2,000; and
that in pursuance of the authorization so given the various
settlements were made.  The final letter to Mr. Baker, writ-
ten December 6, 1899, after the settlements were all made,
is very significant as to the view *Mr. Sabin* then took of his
relation to the condemnation proceedings.  He says:

" I would like personally to have carried on this fight, but
from your recent conversation, and after looking over the
whole situation, I made up my mind that in the end it would
cost as much to make the fight as it would to settle. . . .
I have concluded it was better to make the best of a bad
bargain, and try and get out of it as cheaply as possible.
The next thing, of course, will be settlement with the trust
company, which is bad enough."

It will be noticed that these condemnation proceedings
were in progress when the amicable action to foreclose the
lien upon *Sabin's* bonds was brought by the trust company,
and that judgment in that action was rendered July 29,
1898, some twenty days after *Sabin* had authorized the set-
tlement of the Spring Valley claim; and that the bond in
suit was given in October following that settlement, and
just prior to the settlements with Baldwin and McKay.
That *Mr. Sabin* has practically construed the reorganization
agreement to mean just what the plaintiff now claims to be
its meaning is not open to doubt upon these facts.   That
the settlements were favorable settlements, and the amounts
paid were only such as were reasonably necessary, does not
seem to be controverted, except in the case of the Nelson
claim, to which reference will be made later.

While these considerations seem conclusive as to the construction of the reorganization agreement as between *Sabin* and the plaintiff, it is contended that they are not conclusive as to the construction of the bond upon which the action is brought, especially as to the liability of the appellant the *Fidelity & Guaranty Company*, which is simply a surety on the bond, and whose obligation is *strictissimi juris*. The bond was given more than two years after the reorganization agreement was signed. The conditions of paragraph 4 of the agreement were imported bodily into the bond by its very terms. Certainly the surety should have investigated and ascertained for himself what those conditions were, and must be held to be bound by them. He cannot now be heard to say that he was not informed as to their character. He has agreed that they shall be performed, whatever they are. It is true that a surety is a favorite in the law, and that his liability will not be extended by construction; but when it becomes necessary to construe a contract which he has made the same test is to be applied as in construing any other contract, namely, What was the intention of the parties as disclosed by the instrument read in the light of the surrounding circumstances? Brandt, Suretyship & G. § 94. If we are right in our conclusion that paragraph 4 of the reorganization agreement requires no construction, but on its face definitely refers to the claims under consideration,— in other words, if the clause is clear and unambiguous,— the surety must, of course, be bound equally with the principal by its clear meaning. If, on the other hand, it is at all doubtful and open to construction, then the surrounding facts may be resorted to in ascertaining the proper construction as well against the surety as against the principal. Those facts leave no doubt as to the proper construction of the bond. Upon its face it informs the surety that some of the conditions of paragraph 4 were yet unperformed, and that the plaintiff was expected to incur expense in performing them. At this

very time there had been pending for some months condemnation proceedings for the purpose of wiping out the claims of title in question. *Sabin* was recognizing these claims as claims which he must remove under his agreement; had authorized settlement of some, and was actively negotiating for settlement of others. There is no suggestion that there was any concealment of the situation at that time, or any collusion between *Sabin* and the plaintiff. They were proceeding to carry out the terms of paragraph 4 of the agreement as they understood them, and in a manner clearly within their reasonable meaning. Not only were such acts, which took place prior to or contemporaneous with the execution of the bond, admissible to show the situation of the parties at the time of the transaction, but the subsequent acts of *Sabin* in authorizing settlements of claims were admissible also as a part of the *res gestæ*. Acts and declarations of the principal which take place in the course of the transaction of the business for which the surety is bound become a part of the *res gestæ*, and are evidence against the surety. Brandt, Suretyship & G. § 627.

It is strenuously argued, especially on behalf of the surety, that none of the parties named had any valid claim against the new railway company; that under the principles laid down in the *Hooe Case*, 98 Wis. 302, and the *Kuhl Case*, 101 Wis. 42, they had no title to any part of the right of way, nor any claim against the new railway company; that they could neither maintain condemnation proceedings nor actions for money judgments. It is further argued that the word "claims," as used in paragraph 4 of the reorganization agreement, should be construed as meaning valid claims against the new railway or its property, and not trumped-up claims without legal foundation of any kind, which the claims in question are said to have been. The argument is specious, but not tenable. It should be remembered that the reorganization agreement was made in August, 1896,

long before the decision in the *Hooe Case* was made.   It is
very evident that all the parties at that time regarded the
claims in question as quite real and troublesome claims,
which would have to be settled with in some way before a
clear title to the right of way was obtained.   And, indeed,
we do not know that it has yet been decided that the claim-
ants were absolutely without remedy of some kind.   Neither
the *Kuhl Case* nor the *Hooe Case* so decides.   It is probably
true that as a result of the doctrine of those cases the claim-
ants could not maintain condemnation proceedings nor ob-
tain personal judgments against the new railway company,
although it is not necessary to so·decide in this case; but it
does not necessarily follow that the new company could
appropriate the lands and permanently use them without
let or hindrance from the original owners.   The powers of
a court of equity to prevent manifest injustice are quite ex-
tensive, as is evidenced in the case of *Stolze v. M. & L. W.
R. Co.* 104 Wis. 47, where an injunction was allowed to pre-
vent an injustice of a similar nature.   But whether there
was in fact any legal remedy open to the property owners
or not is not a question of great moment.   Certain it is that
the property owners were making vigorous and *bona fide*
claims; that both the plaintiff in this action and *Mr. Sabin*
regarded them as serious claims, and that they chose to
enter into an agreement that these very claims should be
satisfied and released by *Mr. Sabin* before he received his
bonds; and that the surety in this action signed a bond to
secure the faithful performance of the condition.

The view we have taken of the case renders unnecessary
any detailed review of rulings on evidence or of the charge
of the court.   As we view the case, the evidence left no
question but that the bond covered the very claims in ques-
tion, and the only question for submission to the jury was
as to the amount of the damages.   Upon this question the
court instructed the jury, in substance, that whatever sums

*Sabin* authorized the plaintiff to pay in settlement of any of the claims aforesaid were to be allowed, and, as to the claims not authorized by *Sabin* to be paid, such sums were to be allowed as the evidence showed to be just, necessary, and proper in order to secure settlement; that, if *Sabin* knew of the commencement of the condemnation proceedings, and was informed of their progress, and acquiesced therein, then the necessary disbursements and reasonable value of the attorney's services in such proceedings might also be recovered; that, if he did not know of them, and the proceedings were unnecessary, there should be no recovery for the disbursements and attorney's fees therein, but, if they were proper proceedings for the plaintiff to institute in order to adjust these claims, then the disbursements and attorney's fees should be allowed.   Under the principles of law already laid down in this opinion, it is very evident that, there being no claim of fraud or collusion between *Sabin* and the plaintiff, these instructions were fully as favorable to the defendant surety as it was entitled to demand, and certainly there can be no claim that they were erroneous as to the defendant *Sabin.*

As to the claim of $100 paid to Nelson, we have been unable to find any evidence in the record from any source that the amount paid him was a reasonable and proper amount in settlement, or that *Mr. Sabin* ever authorized the payment of that sum, or any sum, in settlement of the claim; and we think, therefore, that this sum was improperly allowed.  As this is a sum certain, the judgment may be modified in this court by striking out the improper item, with interest, and affirmed as modified.

*By the Court.*— Judgment modified by deducting therefrom the sum of $110.85, and, as so modified, affirmed.   No costs are to be allowed except clerk's fees, attorney's fees, and $25 for printing, to be taxed in favor of appellant.